**Ben MARTINEZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 96–242.**

Supreme Court of Wyoming.

Aug. 8, 1997.

Sylvia L. Hackl, State Public Defender; and Donna D. Domonkos, Appellate Counsel, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker–Musick, Assistant Attorney General, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

MACY, Justice.

Appellant Ben Martinez appeals from the judgment and sentence which the trial court entered after a jury found that he was guilty of conspiring to deliver a controlled sub-

stance and attempting to deliver a controlled substance.

We affirm.

## ISSUES

Martinez presents three issues for our analysis:

*ISSUE I*

Were the incriminating statements the appellant made to DCI agents following his arrest and before being read his *Miranda* rights voluntary under the totality of the circumstances?

*ISSUE II*

Was the evidence produced at trial ... sufficient to prove beyond a reasonable doubt all elements of conspiracy to deliver a controlled substance?

*ISSUE III*

Was the appellant's right to effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and Art. 1[,] § 10 of the Wyoming Constitution violated denying the appellant's right to a fair trial?

## FACTS

At 5:00 a.m. on September 1, 1995, a confidential informant for the Division of Criminal Investigation (DCI) contacted Martinez, seeking to buy morphine. The informant was wearing a wire and was under surveillance at that time. Due to the early hour, Martinez told the informant that he would contact her between 8:30 and 9:00 a.m. and that he could get her five to ten vials of morphine for $200 each. When Martinez telephoned the informant at her home later that morning, DCI agents tape recorded the conversation.

After being again fitted with a wire monitor and being given $1,000 in recorded buy money, the informant drove to Martinez's home. Martinez got into the informant's vehicle, and they left to go meet Martinez's source. While they were en route, Martinez asked the informant to pull into a grocery store parking lot so that he could call his source to make sure that he was still at the agreed upon meeting place. When Martinez returned to the car, he told the informant that his source was "jittery" but that he thought he could still get five vials of morphine. The informant drove a short distance further before Martinez had her stop at a convenience store so that he could make another telephone call to his source. When Martinez returned to the car, he acted "jittery" and told the informant that he had to meet his source alone. He left in the informant's car with the buy money and returned approximately twenty minutes later. At that time, he told the informant that DCI agents had followed him and that he had decided not to go to his source's house. He went inside the convenience store where he again called his source. While Martinez was talking on the telephone, DCI agents entered the store and arrested him.

Martinez was placed in the back seat of a DCI car. Although he had not been informed of his *Miranda*[1] rights or questioned, a conversation between Martinez and a DCI agent ensued during which Martinez identified his source. Martinez told the agents that he would give them directions to his source's house, but, as they drove to the area where Martinez had indicated that his source lived, Martinez announced that he did not want to cooperate and that he wanted to be taken to jail.

On the basis of Martinez's statements, DCI agents recovered the buy money and obtained a warrant to search the source's home. Approximately twenty minutes after they arrested Martinez, the DCI agents searched the source's residence. They recovered three syringes of morphine and a dispensing device which contained approximately ninety cc's of morphine.

A jury found that Martinez was guilty of conspiring to deliver a controlled substance and attempting to deliver a controlled substance. The trial court sentenced him to serve consecutive imprisonment terms at the Wyoming State Penitentiary of not less than four years nor more than eight years for the conspiracy conviction and not less than one year nor more than three years for the at-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tempt conviction. The trial court also ordered that the sentences would run consecutively to another sentence which Martinez was serving. Martinez appeals to this Court.

## DISCUSSION

### A. *Miranda* Warnings

Martinez claims that the incriminating statements which he made to the DCI agents after he was arrested and before he was informed of his *Miranda* rights were involuntary and were the product of a custodial interrogation. He maintains that his statements, as well as the evidence which was recovered as a result of those statements, should have been suppressed.

 The United States Supreme Court has determined that the ultimate issue of voluntariness is a legal question which merits a *de novo* review. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985); *Stone v. State,* 745 P.2d 1344, 1348 (Wyo.1987). We will not disturb a trial court's findings on the factual issues of a motion to suppress unless the findings are clearly erroneous. *Southworth v. State,* 913 P.2d 444, 447 (Wyo.1996). Since the trial court conducts the hearing on the motion to suppress and has the opportunity to assess the witnesses' credibility, to weigh the evidence, and to make the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination. *Wilson v. State,* 874 P.2d 215, 218 (Wyo.1994).

 In deciding this issue, we must determine whether Martinez was being subjected to a "custodial interrogation" when he made the statements at issue. *Bland v. State,* 803 P.2d 856, 860 (Wyo.1990).

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

*Southworth,* 913 P.2d at 449 (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)).

The United States Supreme Court in *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, and this Court in *Priestley v. State,* 446 P.2d 405, 407–08 (Wyo.1968), framed the relevant inquiry:

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess.... *Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [Miranda].*"

*Bland,* 803 P.2d at 860 (emphasis in original).

In *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1688–89 [1689], 64 L.Ed.2d 297, 306–07 (1980), the Supreme Court defined the term "interrogation" for constitutional purposes. The Court recognized that " '[i]nterrogation' ... must reflect a measure of compulsion above and beyond that inherent in custody itself." The Court then defined interrogation as "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. The *Innis* court points out that the definition of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

*Johnson v. State,* 806 P.2d 1282, 1287 (Wyo. 1991). In the case at bar, the trial court conducted a hearing to consider the admissibility of the statements. At that hearing, the State stipulated that Martinez was in custody when he made the incriminating statements. The State also admitted that *Miranda* warnings had not been given but argued that Martinez volunteered the statements and did not give them as a result of being interrogated.

The State presented testimony from a DCI agent who said that, immediately after Martinez was arrested, he was placed in the back

seat of a DCI car. The agent explained that, although Martinez had not been asked any questions, Martinez said that he knew what he did was wrong, that he knew he was in trouble, and that he wanted to cooperate in any way he could. According to the agent, Martinez then stated that he was on the telephone with his source when he was arrested and that he told his source what was happening. The agent stated that Martinez again said he wanted to cooperate and that he informed the agents that, prior to making the telephone call, he had been on his way to his source's house but that, because he believed he was being followed, he decided to call his source instead. The agent also testified that, in response to Martinez's statement that he wanted to cooperate, he told Martinez that it would be nice to know from whom he was getting the morphine and that Martinez revealed the name of his source at that time.

■■■ The State correctly points out that, at least until the agent commented that it would be nice to know who the source was, Martinez made his statements without being prompted. He had not been questioned at all up to that point, and *Miranda* warnings were, therefore, not required. "A statement that is not the product of interrogation or compulsion attributable to authorities or some other improper action[ ] is voluntary and admissible." *Griffin v. State,* 749 P.2d 246, 254 (Wyo.1988). Martinez argues, however, that the evidence which was seized during the search of the source's residence should have been suppressed because it was the fruit of the poisonous tree. Although this Court has come close to addressing the issue of whether evidence should be excluded under the fruit-of-the-poisonous-tree doctrine because of a *Miranda* violation, we have not been required to face it squarely. *See Stamper v. State,* 662 P.2d 82, 91 n. 8 (Wyo. 1983). We do not believe that this case warrants such a discussion either since, as described below, sufficient evidence, without the evidence which was seized from the source's house, supported Martinez's conviction for conspiring to deliver a controlled substance. Even if we were to assume, without deciding, that the trial court erred when it admitted the evidence which was seized

from the source's house, any error would be harmless and, therefore, not reversible given the fact that the evidence was otherwise sufficient to sustain Martinez's conviction.

**B. Sufficiency of the Evidence**

Martinez contends that the evidence which was produced at the trial was not sufficient to prove all the elements which were necessary to convict him of conspiring to deliver a controlled substance.

■■■ In reviewing sufficiency-of-the-evidence issues, we observe the following standard:

This Court assesses whether all the evidence which was presented is adequate enough to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State. We leave out of consideration entirely the evidence presented by the unsuccessful party which conflicts with the successful· party's evidence, and we afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. We have consistently held that, even though it is possible to draw other inferences from the evidence which has been presented, the jury has the responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Bloomquist v. State,* 914 P.2d 812, 823–24 (Wyo.1996) (citations omitted).

W.S. 35–7–1042 provides in part:

Any person who attempts or conspires to commit any offense under this article within the state of Wyoming ... shall be punished by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy.

The relevant portion of W.S. 35–7–1031 states:

(a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:

(i) A controlled substance classified in Schedule I or II which is a narcotic drug, is guilty of a crime and upon conviction may be imprisoned for not more than twenty (20) years, or fined not more than twenty-five thousand dollars ($25,000.00), or both[.]

 For a conspiracy-to-deliver-a-controlled-substance conviction to be sustained, the evidence must show beyond a reasonable doubt that the parties to the conspiracy voluntarily agreed to commit an offense under the Wyoming Controlled Substances Act of 1971. *Urrutia v. State*, 924 P.2d 965, 969 (Wyo.1996). The existence of an agreement may be established in whole or in part by circumstantial evidence, and it is not necessary to demonstrate that the conspirators performed an overt act to complete the agreement's objective. *Mondello v. State*, 843 P.2d 1152, 1161 (Wyo.1992).

 In *Smith v. State*, 902 P.2d 1271 (Wyo.1995), we considered what type of agreement was necessary for a conspiracy to exist.

"One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement. . . .

"Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this prob-

lem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'"

902 P.2d at 1281–82 (quoting WAYNE R. LA-FAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW at 460–61 (1972)).

The informant in this case testified that Martinez agreed to procure five to ten vials of morphine for her but that he had to get it from his source. She also explained in detail how Martinez called his source at different times while they were on their way to the source's house. Additionally, the jury heard a recording which had been made of the discussions that occurred between the informant and Martinez throughout the course of this transaction. The recording allowed the jury to hear Martinez making a deal with the informant to get morphine for her from another source. The deal specified the price for, as well as the amount of, morphine which was available. Furthermore, Martinez told DCI agents that he was on his way to get the morphine but that he changed his mind when he discovered he was being followed. He also informed them that he had received the buy money from the informant.

 This evidence demonstrated that Martinez was planning to purchase morphine from his source and to deliver it to the informant. We hold, after reviewing the evidence in the light most favorable to the State, that the jury had sufficient evidence before it to conclude beyond a reasonable doubt that Martinez had an agreement with another person to violate the controlled substances act.

## C. Effectiveness of Counsel

Martinez claims that he was denied his constitutional right to have effective assistance of counsel at his trial. He maintains that his counsel's performance was "outside the wide range of professionally competent conduct" and that the deficient performance compromised the adversarial process and affected the outcome of his trial. He asserts that his counsel did not object to the admission of or attempt to suppress the taped conversations between himself and the informant. He also contends that his counsel did

not effectively cross-examine the State's witnesses or present a defense.

For Martinez to prevail on his ineffective-assistance-of-counsel claim, he must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Rigler v. State*, 941 P.2d 734, 741–42 (Wyo.1997). We have reviewed the relevant portions of the record and conclude that the counsel's performance was not unconstitutionally deficient. Since we are satisfied that the counsel's performance did not compromise Martinez's defense, we will not address each point of error which Martinez raises with respect to the effectiveness of his counsel.

## CONCLUSION

Martinez has failed to establish that reversible error occurred or that his trial counsel's performance was defective. His judgment and sentence is, therefore,

Affirmed.